GREYLOCK BROADCASTING
COMPANY, Petitioner,

v.

UNITED STATES of America and
Federal Communications Com-
mission, Respondents,

Hudson Valley Broadcasting Company,
Inc., Intervenor.

No. 12989.

United States Court of Appeals
District of Columbia Circuit.

Decided Feb. 14, 1956.

Danaher, Circuit Judge, dissented.

Messrs. James A. McKenna, Jr. and Vernon L. Wilkinson, Washington, D. C., for petitioner.

Messrs. Warren E. Baker, General Counsel, Richard A. Solomon, Assistant General Counsel, and Daniel R. Ohlbaum, Attorney, Federal Communications Commission, for respondent, Federal Communications Commission.

Mr. Daniel M. Friedman, Attorney, Department of Justice, for respondent United States.

Messrs. D. M. Patrick and Stanley S. Harris, Washington, D. C., for Hudson Valley Broadcasting Company, Inc., Intervenor.

Before PRETTYMAN, BAZELON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

On December 9, 1955, this court stayed that part of an order of the Federal Communications Commission which would have allocated television Channel 10 to Vail Mills, New York. The intervening broadcaster (Hudson Valley Broadcasting Company, Inc.) now moves that we reconsider and vacate the stay. Its ground for so moving is that the action of the court was under Section 9(b) of the Judicial Review Act, 64 Stat. 1131 (1950), 5 U.S.C.A. § 1039(b); that that section requires as a premise for a stay a specific finding that irreparable damage would otherwise result to the petitioner (i. e., Greylock Broadcasting Company); that this court made no such finding; and that no such finding is possible upon the evidence of record.

The controversy revolves about the UHF-VHF television problem presently before the Commission. UHF broadcasters have experienced grave difficulties of an economic sort due to the wide ownership by the public of VHF receiving sets and the costs of either converting or of adding UHF receivers. Thus, where both types of transmission are in use in an area, the network services and the consequent greater proportion of the remunerative commercial contracts have been going to the VHF stations. The

situation has developed to such a point that the Commission instituted a rule-making proceeding, nationwide in scope, to consider, among other alternatives, the desirability of the "deintermixture" of the two services. The broad meaning of the deintermixture proposal is the desirability of so redistributing allocations as to eliminate or lessen the competition between the two types of service in specified areas. That proceeding is now pending before the Commission, and the stay here involved does not impede or interfere with its progress in any manner whatsoever.

The area involved here is the Albany-Schenectady-Troy area in New York. Presently, under the Sixth Report of the Commission, seven UHF and one VHF commercial television channels are allocated to the area. Our intervenor, Hudson Valley, is now the owner of a UHF license. It calculated that under the Commission's engineering regulations as to spaces, distances, etc., another VHF allocation (Channel 10) could be made to the area if the station were located at Vail Mills, a small community about twenty miles northwest of Schenectady. It made a proposal to that effect to the Commission. At about the same time proposals and counter-proposals for the deintermixture of the area were made.

The Commission, by a four-to-three vote, granted the allocation of Channel 10 to Vail Mills but put the deintermixture problem of the area into the nationwide rule-making proceeding. Greylock and the Van Curler Broadcasting Corporation, both UHF operators in the area, protested and then appealed. We stayed the allocation of Channel 10 pending disposition of Greylock's petition for review.

The Sixth Report and Order of the Commission, adopted April 11, 1952, was the final report in proceedings instituted in 1948. It established a nationwide table of assignments for television frequencies and made separate "final assignments" of channels to the various communities in the country. The allocation of Channel 10 (VHF) to this area is not in the Sixth Report or in any allocation heretofore made. It is a new allocation, a "drop-in", permissible under engineering limitations but not heretofore allowed. Greylock avers, with proffer of proof, that if this second VHF station goes into operation in the area, under the auspices and with the contracts presently available for such a station, it (Greylock) will be forced off the air. Its averment is borne out by the common experience of others. As we understand it, no one disputes the dire effects upon UHF operations of competing VHF services in the present state of the art.

The mere allocation of the channel to the area is not, of course, the award of a license; it is indeed a long way from that conclusion. But it is a first step. The new allocation poses in practical and realistic form a threat to the continuance of the UHF stations. If the channel remains thus allocated a license on it will surely be awarded to somebody sometime. It is quite clear that, if the new allocation of a VHF station is made temporarily, all of Greylock's plans, programs and commitments, both for revenue and for expenditure, must be upon a conditional basis; its future is undetermined. Immediately the new allocation is made and the new station becomes a close possibility, Greylock's operation takes on a conditional character. Obviously operation upon such a basis causes losses in comparison to operation absent such pending contingencies; and that such losses cannot be recouped is also obvious. It is clear from the material offered by Greylock that if a license is open for award upon the new channel it (Greylock) will either have to acquire that license (by award or by purchase) or be driven off the air. Of course the mere pendency of the proposed allocation poses some part of the threat to Greylock, but the accomplishment of the allocation, making the presence of the available channel an accomplished fact, greatly magnifies those incipient losses.

It is noteworthy that on the same day it granted the Vail Mills "drop-in" the Commission denied all other requests for changes in the present table of assignments pending the rule-making deintermixture determination.

Hudson Valley and the Commission say that Greylock's choice in the presence of the allocation is merely a matter of business judgment. But this sort of gun-to-the-head choice is not what is customarily known as the exercise of business judgment.

A question presented by Greylock's petition for review is whether it (Greylock) was entitled to a hearing before finalization of the allocation of Channel 10 to this area; that is, whether under presently known facts an operating UHF station is entitled to a hearing before the allocation of a new VHF channel. As presented the question involves due process considerations. The question posed is a substantial one. We intimate no view whatever upon the matter. Our present concern is merely that the question is substantial. The making of the allocation now, while the question whether it is ultimately to remain is under formal consideration by the Commission, serves no useful purpose, so far as we can ascertain from the material before us. The Commission says it will now allocate the channel to the area and hereafter decide whether to leave it there. Greylock urges, and we agree, that every interest of fair distribution will be served by postponing the allocation until the Commission decides, in the proceeding already under way, whether there is to be such an allocation to this area.

No public interest is served by an immediate allocation. Under present allocations the area is predominantly—seven to one—UHF. Only one VHF station is operating, and some of the national networks in their competition with one another must use one of the two UHF stations now in operation. The public has bought and is buying its receiving sets in the light of those facts. If the Commission finally decides to leave the area as it is now, the public will buy, or retain, its sets in light of that fact. If the Commission decides to allocate permanently another VHF channel, it seems to be agreed that the UHF stations will fold. The public will thereafter be governed by that circumstance. If a VHF allocation is made temporarily, pending consideration of its permanency, complete public uncertainty is created; both owners and buyers of sets would be thrown into a whirlpool of sales pressures, possibly to no permanent purpose. We see no public benefit in such a completely uncertain temporary arrangement.

Our dissenting brother says the public interest criterion should control in this matter. But the public interest in the UHF-VHF problem is the precise question which is to be answered by the Commission in the deintermixture proceeding. If UHF stations are not in the public interest they could not be authorized at all. If this court were to declare now that a new VHF station, which would eliminate UHF stations presently in an area, is in the public interest, that declaration would conclude the whole controversy now being so exhaustively explored by the Commission. We cannot do that on the evidence before us; indeed it is not our function to declare initially what is in the ultimate public interest. Our function goes to the preservation of an existing situation *pendente lite* where irreparable damage would ensue from an immediate and possibly temporary change.

Our dissenting brother also says the public wants VHF reception. But we do not know that to be so. The wide use of VHF sets may be due to the fact that VHF was available earlier, gave good service, and saturated the market before UHF came. The present wide ownership of VHF sets is not necessarily an indication that UHF is not better physical service and will not be preferred by the public when, as and if programs over it are comparable with VHF programs and VHF sets wear out. Progress and change are frequently in the public in-

terest. The Commission, as we understand it, has that problem, among others, before it in the pending rule-making (deintermixture) proceeding.

We find specifically that the present allocation of Channel 10 to the Vail Mills area pending the outcome of the deintermixture proceeding would impose upon Greylock losses which it could not recover, and that this threat of loss is not offset by any vantage to the public interest.

The motion to reconsider and vacate our stay order will be denied.

DANAHER, Circuit Judge (dissenting).

Pursuant to a proposal filed by Hudson Valley Broadcasting Company, Inc., found to comport with the Commission's present television allocation plan and rules, the Commission assigned VHF Channel 10 to Vail Mills, New York. The stay which the majority grants would have the effect not merely of precluding the Commission from accepting, processing and holding any hearing on applications for that channel until the present action shall have been finally determined. It would do more. The majority intends it to do more. As a practical fact, the majority would stay the Commission's hand "pending the outcome of the deintermixture proceeding." Under the circumstances of this case, such interference with the performance by the Commission of the duties entrusted to it does such violence to my understanding that I am bound to dissent.

The differences between my colleagues and me involve issues of policy in the division of authority as between the Commission and the court. It seems to me established that the public interest criterion should control. "Courts and administrative agencies are not to be regarded as competitors in the task of safeguarding the public interest. * * Courts no less than administrative bodies are agencies of government. Both are instruments for realizing public purposes."[1] Again the Court told us: "It is always easy to conjure up extreme and even oppressive possibilities in the exertion of authority. But courts are not charged with general guardianship against all potential mischief in the complicated tasks of government. * * Interference by the courts is not conducive to the development of habits of responsibility in administrative agencies."[2]

Such thinking should govern the instant case. Here, the Commission out of its own expertise found that the public interest required that additional VHF television broadcasting on available Channel 10 be brought to the affected area at the earliest possible moment. The Commission says: "Refusing to make use of this valuable VHF frequency as contemplated by the present rules would, we believe, be a waste of valuable spectrum space for which active demand is indicated. Channel 10 in Vail Mills will represent a second television service to an appreciable percentage of families residing in the area as well as a first service to a significant number of families." Surely the Commission is authorized to make such a finding and to interpret the Act so as to achieve its purposes.[3]

1. Scripps-Howard Radio v. Federal Communications Commission, 1942, 316 U.S. 4, 15, 62 S.Ct. 875, 882, 86 L.Ed. 1229.

2. Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U. S. 134, 146, 60 S.Ct. 437, 443, 84 L. Ed. 656.

3. 47 U.S.C.A. § 301; § 303 (b), (d), (g), (h) and (r), among others; § 403.

   "The Supreme Court has admonished us many times to give 'great weight' to an agency's interpretation of its governing statute * * *." Bazelon, J., in West Texas Utilities Co. v. N.L.R.B., 1950, 87 U.S.App.D.C. 179, 181, 184 F. 2d 233, 235.

   "We are in accord here with the authorities which require great weight to be given an administrator's interpretation of the statute he is directed and empowered to administer." Prettyman, J., in Union Manufacturing Co. v. N.L.R.B., 1955, 95 U.S.App.D.C. 252, 255, 221 F.2d 532, 536, certiorari denied 1955, 349 U.S. 921, 75 S.Ct. 660.

It is correct, as the majority say, that "Greylock and the Van Curler Broadcasting Corporation,[4] both UHF operators in the area, protested[5] and then appealed." Greylock, a UHF station, says it will be "irreparably injured" if the public is given what it wants, namely VHF television broadcasting.

Greylock's president and principal stockholder, in his affidavit supporting its motion for an immediate stay, tells us that "Operation on Channel 10 is at least a year away." But the Commission's rule-making proceedings may not be concluded within a matter of years.

Greylock's affidavit adds that if Channel 10 comes on the air, Greylock cannot successfully operate in the area to be served. This is another way of saying that the public demands the superior entertainment and the network broadcasting to be provided by VHF. I do not understand that any licensee is guaranteed freedom from competition. Indeed, § 304 of the Act, 47 U.S.C.A. § 304, provides:

"No station license shall be granted by the Commission until the applicant therefor shall have signed a waiver of any claim to the use of any particular frequency or of the ether as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise."

Our case comes to this, Greylock, WMGT, insists that the court shall provide it with a listening audience. I have no doubt that Greylock can be heard both in the Hudson Valley proceeding and in the Commission's rule-making hearings, now under way. Moreover, it can itself apply for Channel 10. Yet because the majority here finds "irreparable injury" it would stay the Commission's hand.[6]

Greylock asks the court to stay the Commission's hand to obviate "cancellation of UHF conversion orders." Thus the court is asked to stimulate the sale of converted sets which will represent a totally unnecessary expenditure by the viewing public if and when Greylock closes down its UHF broadcasting. That is Greylock's plan. Its president swears: "It will definitely be my recommendation to the petitioner's Board of Directors that WMGT discontinue its UHF operations if and when Channel 10 is utilized at Vail Mills. I am certain that the Board will adopt my recommendations." Since he is president and principal stockholder, it is reasonable to conclude that the corporation will do exactly as he says. So, after the area is saturated with conversions, Greylock will immediately apply for Channel 10 if this court shall have refused to stay the Commission's order.

Such evidence has been submitted. In my judgment, it falls far short of creating that degree of public injury for which Greylock in its own private interest is being permitted to speak. "The award of an interlocutory injunction by courts of equity has never been regarded

---

4. We unanimously denied Van Curler's motion for a stay. Van Curler went off the air voluntarily, not because of a VHF allocation to Vail Mills but because Van Curler lost its network affiliation.

5. Although not in point here, the desire of Congress may be seen from Public Law 391, approved January 20, 1956, which amended § 309(c), the protest provision of the Act. 47 U.S.C.A. § 309(c). To accompany H.R. 5614 which became Public Law 391, Senate Rep. No. 1231 explained:
   "The public may be deprived unnecessarily for a prolonged period of time of new radio or television service pending the outcome of the protest hearing. The

Commission is now required, except where the continuance of an existing service is concerned, to stay the effectiveness of any protested grant until it issues a final decision on the protest after a full evidentiary hearing. Even where there is a pressing need for the service in question and little or no likelihood exists that there will be any grounds shown for setting aside the grant, the Commission is given no discretion to consider whether the public interest requires the grant to remain in effect."

6. Cf. Allen v. Grand Central Aircraft Co., 1954, 347 U.S. 535, 540, 74 S.Ct. 745, 98 L.Ed. 933.

as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." [7]

I do not know what criteria will be relied upon by the Commission when it considers various proposals for "deintermixture." Moreover an ultimate disposition does not necessarily depend upon deintermixture, especially since desirable programming and live network telecasting are important facets in the public's choice. The November 10, 1955, "Notice of Proposed Rule Making" poses many of the complexities of a most difficult problem, the intricacies of which are singularly matters for Commission decision. Perhaps VHF operations on Channel 10 in this very area would have afforded the Commission data and information which would be invaluable in arriving at a correct result, whether it be a different allocation or a share-the-time form of broadcast or what not. At any rate, the solution lies singularly within the Commission's orbit, and meanwhile a needed and a wanted service should be provided. Steps to insure that it will be provided could have been taken—except for the court. I do not understand that we are the sole guardians of the "public interest."

It may well be that there should be more, not less competition. It may well be that there should be fewer UHF stations with greater power permitted to those allocated to a given area. The Commission has here specifically found that operation of Channel 10 is *in the public interest*. "If time and changing circumstances reveal that the 'public in-terest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations."[8] I believe the Commission's action was dutiful and within its province.

That is why I say my differences with my colleagues are fundamental. The claim for equitable relief is being treated as though the issue involved only a controversy between two litigants, while our true concern should involve a recognition of the proper distribution made by Congress for the exercise of legal authority by the Commission on the one hand, and by the courts on the other. It seems to me appropriate to recall what the Court said in the WJR case:[9]

"At the outset we note our complete agreement with the Court of Appeals that the Commission was under no duty to WJR to postpone final action on the Coastal Plains permit until it had disposed of the clear channel proceeding. As the court pointed out, WJR had no vested right in the 'supposititious eventualities' that the Commission at some indeterminate time might modify its rules governing clear channel stations. Furthermore, the judicial regulation of an administrative docket sought by WJR 'would require [the Court of Appeals] to direct the order in which the Commission shall consider its cases.' And this, as the court said, it 'cannot do.' 174 F.2d [at page] 231."

But, here the majority would do it.

7. Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834, and see Scripps-Howard Radio v. Federal Communications Commission, supra, note 1, 316 U.S. at pages 14, 15, 62 S. Ct. at page 882, 86 L.Ed. 1229.

8. National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 225, 63 S.Ct. 997, 1013, 87 L.Ed. 1344; cf. Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 475, 476, 642, 60 S.Ct. 693, 84 L.Ed. 869; cases cited in testimony of Commissioner Coy, Hearings Before the Committee on Interstate and Foreign Commerce of the House on S. 658, 82d Cong., 1st Sess., p. 124 et seq. (1951).

9. Federal Communications Commission v. WJR, 1949, 337 U.S. 265, 272, 69 S.Ct. 1097, 1102, 93 L.Ed. 1353.